K.R.S., a minor, by his Guardian,
Connie McClarnon,
Plaintiff(s),

v.

BEDFORD COMMUNITY SCHOOL
DISTRICT, Joe Drake, Individually
and in his official capacity as Super-
intendent of Bedford Community
School District, Dana Nally, Individu-
ally and in her official capacity as
Principal of Bedford High School,
Deb Bonde, Individually and in her
official capacity as Dean of Stu-
dents/Special Services Coordinator,
Robert McCoy, Individually and in his
official capacity as football coach of
Bedford High School, and Andrea
Schuelke, R.N., Individually and in
her official capacity as school nurse,
Defendant(s).

No. 4:13–cv–00147–HCA.

United States District Court,
S.D. Iowa,
Central Division.

Signed April 20, 2015.

Thomas P. Slater, Michael T. Norris, Slater Norris PLC, West Des Moines, IA, for Plaintiff(s).

Gregory G. Barntsen, Smith Peterson Law Firm LLP, Council Bluffs, IA, for Defendant(s).

## RULING GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HELEN C. ADAMS, United States Magistrate Judge.

Before the Court is defendants' motion for summary judgment [34], filed November 4, 2014. Plaintiff has resisted the motion [47, 48 and 55] and defendants have replied to the resistance [52–54 and 57]. Oral argument was held on January 5, 2015. The Court has jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims raised under

28 U.S.C. § 1367. The case is before the undersigned pursuant to 28 U.S.C. § 636(c). The motion is submitted on the oral arguments and the motion papers.

■ Plaintiff's original Complaint (and subsequent amended complaints) asserted plaintiff K.R.S. was a special education student at defendant Bedford Community School District who was subjected to peer-on-peer bullying and harassment culminating in an incident in October 2012 in which K.R.S. sustained personal injury after football players on plaintiff's own team threw footballs at his head. Plaintiff sued the Bedford Community School District ("School District") and several school district staff in their individual and official capacities: Superintendent Joe Drake, Principal Dana Nally, Dean of Students/Special Services Coordinator Deb Bonde, Football Coach Robert McCoy, and School Nurse Andrea Schuelke, R.N. In his Second Amended Complaint [26] (which is the relevant pleading for purposes of this motion), plaintiff alleged defendants' conduct in allowing the bullying violated § 504 of the Vocational Rehabilitation Act, 29 U.S.C. §§ 794 and 794(a), and the Americans with Disabilities Act [1] (Division IV)(the " § 504 claim"), violated plaintiff's rights under the Equal Protection Clause as enforced by 42 U.S.C. § 1983 (Division V), breached state law fiduciary and professional duties (Division VI), amounted to intentional infliction of severe emotional distress under state common law (Division VII), violated Iowa Code § 280.13C by virtue of defendants' failure to remove K.R.S. from participation in athletic competition (Division VIII), and was negligent in (a) failing to remove K.R.S. from participation in athletic competition under common law duties (Division IX),

and (b) failing to provide reasonable medical care (Division X). Defendants have denied plaintiff's claims, asserting as affirmative defenses that they acted in good faith, were entitled to qualified immunity on the federal claims and to statutory immunity on the state law claims.

Defendants' summary judgment motion challenges all of plaintiff's claims. In partial response, the parties stipulated [56] that Division IV (the § 504 claim) is dismissed against the named individual defendants, that Division V (the § 1983 claim) is withdrawn, and that the remaining claims in Divisions VI–X should be dismissed **without prejudice** against defendants Joe Drake, Dana Nally, Deb Bonde and Robert McCoy. Plaintiff has resisted defendants' summary judgment motion as narrowed by the stipulated dismissal of claims, which leaves the School District and Andrea Schuelke as defendants on the state law claims in Division VI—X and the School District as the sole defendant on the § 504 claim, Division IV.

## I.

### STANDARDS FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (moving party has initial responsibility of demonstrating absence of genuine issue of material fact). "If the movant does so, the nonmovant must respond by submitting

1. The Court notes the parties primarily have analyzed this claim on the basis of the Rehabilitation Act. Because the reach of the Rehabilitation Act and Title II of ADA is the same,

these provisions are reviewed using the same analysis. *See Werth v. Board of Directors of the Public Schls. of the City of Milwaukee,* 472 F.Supp.2d 1113, 1126 (E.D.Wis.2007)

evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir.2011) (en banc) (quoting *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2). "The court need consider only the cited materials, but it may consider other materials in the record." Fed.R.Civ.P. 56(c)(3). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At this stage, the court's function is not to determine credibility, weigh the evidence or determine the truth of the matter. *Id.* at 249, 255, 106 S.Ct. 2505. Instead, the court views the record in the light most favorable to the nonmoving party and determines whether there is a genuine issue for trial. *Id.; see also Torgerson,* 643 F.3d at 1042.

## II.

## FACTS

The material facts are largely undisputed. Where they are in dispute, the Court has drawn inferences in favor of plaintiff for purposes of the summary judgment motion.

### K.R.S. School History

At the time of the incidents alleged in the Second Amended Complaint, K.R.S.[2] was a 16-year-old male who attended the ninth grade at Bedford Community High School. (Def. App. [342] at 3, [34–13] at 351). Defendant Andrea Schuelke, R.N., was the school nurse. (*Id.* [34–13] at 351). The Bedford School District ("School District") is small with approximately 200 students in the high school, breaking down into about 35–40 students in each class from grades 9–12. (Pl. App. [45–1] at 89–90).

K.R.S. had taken eighth grade twice. In March 2012 when he completed eighth grade a second time it became apparent based on his Iowa Assessment scores that K.R.S. was having difficulties in his English class and with written language. (Def. App. [34–19] at 378). The School District, through its special education services, met with K.R.S's grandmother, Connie McClarnon, and K.R.S. to develop an Individualized Education Program (IEP) with the goal of improving his written language deficiencies. (*Id.* at 379).

---

**2.** The Court has referred to all minors identified in this case by initials in conformance with LR 10.h.4.

K.R.S. was to receive most of his education in a regular education setting, with limited time in a special education setting for his written language issues. (*Id.* at 382). The IEP noted he would participate in regular extracurricular activities and would not at-- tend a special school. (*Id.* at 382–383). Although not referenced in the IEP, K.R.S. had been treated with medication for ADHD. (Def. App. [34–3] at 41, 42). K.R.S's behavior, communication and language, and health were not a concern raised in the IEP. (*Id.*)

From the time he was in eighth grade to the time of his injury, K.R.S. testified he was teased by other students, who would call him terms such as "dumb-ass," "stupid," "gay." (Def. App. [34–2] at 13). When K.R.S. was on the bus they would call him names (such as "stupid" and "moron") and make fun of him for playing Minecraft and Pokemon. (*Id.* at 14–15). He testified that in eighth grade he reported the name calling to one teacher, Mrs. Drake, and to the bus driver. (*Id.*) Mrs. Drake did tell the students in class to stop. (*Id.* at 17). In ninth grade K.R.S. reported the name calling to another teacher, Mrs. Burn. (*Id.* at 15). He testified two other teachers, Mr. Ruttenberg and Mr. Standerford, also would stop the teasing in class. (*Id.* at 21). K.R.S. told his grandmother, Ms. McClarnon, about the teasing and she told him to stick up for himself. (*Id.* at 15–16). Ms. McClarnon testified that she reported the bullying in IEP meetings that she attended with school officials. (Def. App. [42.2–43.1] at 50).

A former classmate, S.D., was in the eighth and ninth grades with K.R.S. She provided an affidavit [3] stating that during the 2011–2012 school year she observed other kids call K.R.S. names in the hallways or at lunch and sometimes push him in the hallways. (Pl. App. [45–1] at 2). S.D. was in a class with K.R.S. where Mr. Ruttenberg was the teacher. S.D. stated Mr. Ruttenberg several times told K.R.S. it would be better if he did not say anything during class discussions and Mr. Ruttenberg did nothing when other kids called K.R.S. names in class on "an almost daily basis." (Pl. App. [45–1] at 2). S.D stated kids called K.R.S. names in Mr. Standerford's class and he also did nothing. (*Id.* at 3).

Both of K.R.S.'s sisters, E.S. and K.S., testified K.R.S. was teased a lot on the bus and the kids called him mean names like "retard" and "moron." (Pl. App. [45–2] at 159, 170). Another student, S.A., testified generally he observed K.R.S. get teased and called names on the bus but could not name kids who did the teasing. (Def. App. [34–9] at 302–303). W.D., another student, identified a couple of instances of K.R.S. being teased on the bus although once K.R.S. was the one bothering another kid. (Def. App. [34–11] at 327).

### K.R.S. Joins the Football Team

In the fall of 2012 K.R.S. started the ninth grade. He went out for football, although he did not start the season with the rest of the team. K.R.S. got permission to participate from one of the coaches, got his physical, and started going to practices. (Def. App. [34–2] at 6). K.S., K.R.S.'s sister, testified she would eat lunch with her brother. The "football boys" at a neighboring table would talk about them and flick food at them in the presence of teachers. (Pl. App. [45–2] at 171). While it appears comments were not made directly to K.R.S., K.S. said she overheard the football boys making fun of K.R.S. (*Id.*)

---

**3.** This affidavit is the subject of an evidentiary dispute by defendants addressed later in the ruling.

Although the dates are unclear, K.R.S. may have attended a game at Audubon, Iowa on September 21, 2012. (Def. App. [34–2] at 6). K.R.S. thought he made it to all the practices but two between that date and October 19, 2012 when he went to the doctor. (*Id.*) At practices during this time period K.R.S. testified players would be waiting on the sidelines, waiting to be put in to play. (*Id.* at 7). While they were waiting some players would play catch with the football. (*Id.*) At two or three of the practices K.R.S. testified two players, K.C. and C.D., threw footballs at him and hit K.R.S. in the helmet. (*Id.*) K.R.S. testified they were throwing the footballs at him, it was not just a matter of their throwing it back and forth to each other, and they were "being jerks." . (*Id.* at 8). He estimates he was hit in the head by each four or five times over several practices. (*Id.* at 9). K.R.S. testified he told Coach McCoy and Assistant Coach Nally on different days about the kids throwing footballs at his helmet. (*Id.*) He does not remember what the coaches said in response. (*Id.*) Again, the dates on which this happened are not clear in the summary judgment record and subject to some dispute but these events appear to have occurred at the latest by October 11, 2012. (Def. App. [34–22] at 447–448). One of the players in question, K.C., testified no one tried to purposely hit K.R.S. in the head with a football but thinks K.R.S. could have been hit in the head with a football. (Def. App. [34–10] at 314, 317). The other named player, C.D., testified he saw K.R.S. get hit in the head with a football but C.D. did not purposely throw a ball at K.R.S. (Pl. App. [45–1] at 52, 54). Several other players observed C.D. (or another player) hit K.R.S. in the head with a football. (Pl. App. [45–2] at 123, 175; Def.

App. [34–9] at 299; [34–12] at 340–341). Several players testified they saw K.R.S. get hit hard in a tackle by a third player, D.F., on one occasion. (Pl. App. [45–1] at 54, 70). The coaches did not observe K.R.S. getting hit in the head with footballs and do not remember K.R.S. raising concerns. (Def. App. [34–4] at 142; [34–7] at 205).

### *K.R.S. Medical Issues*

K.R.S. started to have headaches at some point during the football season. One of the assistant coaches who also had teaching duties, Mr. Nally, remembers seeing K.R.S. coming from the nurse's station · during the school day. (Def. App. [34–5] at 161). K.R.S. told Mr. Nally he had a headache and he was going to go home. (*Id.*) Mr. Nally told K.R.S. he would tell Coach McCoy. (*Id.*) Mr. Nally believed the football team had an away game at Earlham that night which would have been October 5, 2012. (*Id.*) Mr. Nally did nothing else with respect to K.R.S.'s headache complaint. (*Id.*) Another assistant coach, Mr. Musich, had K.R.S. as a student in a study skills class. (Def. App. [34–6] at 179). Mr. Musich recalls K.R.S. telling him during that class he had headaches and he went to see the nurse that day, although Mr. Musich did not identify a date on which that complaint was made. (*Id.*) Mr. Musich did not ask K.R.S. anything about what might have caused his headache. (*Id.*) According to Mr. Musich, K.R.S. did not complain of headaches during any practices nor did any other football players report K.R.S. was having headaches. (*Id.*)

According to Nurse Schuelke's records, K.R.S. came to her office on October 5, 2012[4] complaining of a headache and double vision. (Def. App.[34–17]). He report-

4. This date is the subject of some dispute in the record. Nurse Schuelke's notes are the subject of a vigorous evidentiary dispute raised by plaintiff which is discussed *infra* at 1071–73.

ed he had been hit in the head with a football and was concerned he had a concussion. (*Id.*) The notes indicate K.R.S. did not complain of nausea/vomiting, loss of balance or sensitivity to light or sound and his pupils were equal and reactive. (*Id.*) K.R.S. said he would not be playing in the upcoming football game as he was ineligible and Nurse Schuelke's notes indicate she advised him not to participate. (*Id.*) Nurse Schuelke told K.R.S. to tell his grandmother and that she attempted to call the grandmother but there was no answer. (*Id.*) Nurse Schuelke saw K.R.S. again on October 8, 2012 for a complaint of pink eye. (*Id.*) On October 15, 2012 K.R.S. reported to Nurse Schuelke's office again complaining of headache and vision disturbance. (*Id.*) He reported no nausea or vomiting or loss of balance and his pupils were reactive. (*Id.*) Nurse Schuelke's notes indicate she called his grandmother, Ms. McClarnon, who said she would take K.R.S. to doctor at the same time as another grandchild. He had not complained of headaches at home. (*Id.*) Ms. McClarnon testified the first time she heard from K.R.S. about headaches was on the night of October 17, 2012 and then again two days later when K.R.S. said he was having vision problems. (Def. App. [34–3] at 42). Ms. McClarnon testified Nurse Schuelke did not call her about K.R.S.'s headaches, only about his red eye. (*Id.*)

On October 19, 2012 K.R.S. was taken to the Clarinda Hospital Emergency Room complaining of visual problems, balance problems, and headache and neck pain. (Pl. App. [45–3] at 275). An MRI was performed which showed a mass in his head. He was referred to a neurosurgeon; however, before appointments could be made K.R.S. was admitted to Children's Hospital in Omaha the same date for further evaluation. (*Id.* at 277). Doctors there found a cavernous malformation, provided an eye patch to help with the vision problems, advised against contact

sports until follow-up appointment in a month and no school for two to three weeks. (*Id.*) K.R.S. was re-admitted to the hospital on October 31, 2012 after he had a reoccurrence of hemorrhage requiring surgical intervention. (*Id.* at 279). He was transferred to a rehabilitation facility on November 15, 2012. (*Id.* at 286).

### School and Police Investigations

School officials were alerted to K.R.S.'s hospitalization on or about October 22, 2012 after the hospital made a police report on October 19 as a result of K.R.S's injury. (Pl. App. [45–3] at 247). K.R.S. identified C.D. and K.C. as students who threw footballs at his head sometime in the weeks preceding his hospitalization. (*Id.;* Def. App. [34–18] at 365). Principal Dana Nally undertook an investigation, talking with K.R.S.'s grandmother, the football players, the coaches and the school nurse. (Def. App. [34–18] at 365–366). The police came to the school and took formal statements from the football players and coaches. (*Id.*) Coach McCoy denied K.R.S. had ever reported that boys were throwing footballs at him or that he knew K.R.S. was injured. (*Id.* at 366). Principal Nally was unable to interview K.R.S. on the family's request through their attorney. (*Id.* at 368). No criminal charges were brought, nor did the school's investigation conclude with any findings. (*Id.* at 375).

In 2012 the school board had an anti-bullying harassment investigation policy ("Policy") and investigation procedures ("Procedures"). (Pl. App. at 210–212; Def. App. [34–21] at 431–445). K.R.S. and his grandmother were aware of the Policy. (Def. App. [34–2] at 15; [34–3] at 46). The Policy and Procedures provided a two-step process for individuals who felt they had been harassed: First they were to communicate with the harasser that they wanted the behavior to stop and should could seek assistance from a teacher, counselor or

principal to help with that communication. (Pl. App. at 210–212; Def. App. [34–21] at 431). If the harassment did not stop or the individual did not feel comfortable, the individual should tell a teacher, counselor or principal and write down what happened, giving a copy to a teacher, counselor or principal. (*Id.*) Ms. McClarnon admitted that she did not make any reports pursuant to the Policy but rather she told her grandchildren to report incidents to school staff themselves. (Def. App. [34–3] at 46). Prior to the incidents involving K.R.S. the school did keep a log regarding reports of harassment and the consequences imposed for that conduct. (Def.Supp.App.[53]). K.R.S. himself had been reported for harassing conduct in 2010. (Def. App.[34–15], [34–16]).

### Nurse Schuelke's Records and Testimony

The date Nurse Schuelke first saw K.R.S. for a complaint of headache is disputed. Nurse Schuelke was deposed twice. On the first occasion on November 20, 2013, she testified that she kept contemporaneous notes about student visits and care on a daily log in a spiral notebook, then later transcribed the notes into an electronic medical record system (the "JMC"). (Pl. App. [45–2] at 125–126, 128). At the end of the school year she would destroy the spiral notebook after the notes had been transcribed into the JMC; however, for the 2012 school year she kept the October pages pertaining to K.R.S., thinking they might be needed at some point. (*Id.* at 127, 129). She brought them to her deposition and those pages were marked as Exhibits 20 and 20A. (*Id.* at 127, 132, 134). At the time Principal Nally called Nurse Schuelke to obtain information about K.R.S.'s visits with the nurse, Nurse Schuelke relied on the spiral notebook entries to provide dates. (*Id.* at 126). Although she provided information that K.R.S. had seen her on October 5, 2012, she believed he really saw her on October

12 and that she had entered it in her log on the wrong date inadvertently, but Nurse Schuelke did not correct the records when she entered it in the JMC. (*Id.* at 128b). It subsequently came to light during the discovery process that Nurse Schuelke had actually lost the pages she represented to be originals at her first deposition. (*Id.* at 141–42, 144). At her second deposition on November 4, 2014 Nurse Schuelke testified when she went to retrieve the pages for her first deposition, they (and the drawer in which she thought she had placed them) were missing. (*Id.* at 144–145). Instead of informing Principal Nally the originals were missing, Nurse Schuelke "started to panic" and attempted to recreate them from JMC entries. (*Id.* at 143, 146). She admitted Exhibits 20 and 20A were not the original pages as she had previously testified. (*Id.* at 142).

### III.

### LAW AND DISCUSSION

#### A. Evidentiary Issues

Before discussing the merits of plaintiff's claims, there are some threshold evidentiary issues which should be addressed, as they may impact resolution of the substantive issues: the S.D. affidavit, plaintiff's "other incidents" evidence, and a 2013 report by the state following a Comprehensive School Improvement Site Visit.

#### 1. S.D. Affidavit

In response to defendants' summary judgment motion, plaintiff's appendix included an affidavit from a former classmate of K.R.S. named S.D. (Pl. App. [45–1] at 1–4). Defendants object to the S.D. affidavit being part of the summary judgment record. Although S.D. was identified in plaintiff's Answer to Interrogatory No. 16 as a person who observed or had knowledge of alleged bullying, harassment and

assaults on K.R.S., defendants contend that the full substance of her knowledge of events was not apparent until the affidavit was filed with plaintiff's resistance. S.D's deposition was not taken, although at hearing defendants argued they would have taken it had they known the full extent of her knowledge.

The sufficiency of plaintiff's Answer to Interrogatory No. 16 was one of a number of interrogatories addressed in the Court's December 15, 2014 ruling [49] on defendants' motion to compel. Interrogatory No. 16 asked plaintiff to set forth information regarding the individual he claimed bullied or harassed and assaulted him, specifically (a) the date the conduct occurred; (b) a description of the bullying or harassment which occurred on each date; (c) the name, address and phone number of each individual who engaged in bullying or harassment; (d) the name, address and phone numbers of others who observed the conduct on each date; (e) the location of each incident; (f) the names of teachers, coaches or school staff who observed the conduct on each date; (g) the name, address and phone number of teachers, coaches or school staff to whom K.R.S. reported the conduct and whether the reports were verbal or written; (h) a description of the report made and the reply received; (i) the name, address and telephone number of other individuals to whom K.R.S. reported the conduct and the manner in which report was made; and (j) the name, address and phone number of individuals who observed or had knowledge of the conduct on each date. (Def. App. [34–22] at 447–449). Plaintiff had objected on the ground the interrogatory was "overly broad and vague," but, after noting he could not "recall the dates of other incidents and much of the bullying and harassment occurred so often that particular events are difficult to remember," enumerated seven instances of conduct alleged to have occurred in response to subpart (a). (*Id.* at 447).

Four of the incidents described events in the classes of Mr. Ruttenberg, Ms. Thompson, Mr. Standerford and Ms. Drake, one incident involved a fellow student M.J., and the last two involved the two football players alleged to have thrown footballs at K.R.S.'s head. (*Id.* at 447448). At his deposition, K.R.S. was questioned about the incidents described in Answer to Interrogatory No. 16. With respect to the first four involving incidents in the specified teachers' classrooms, K.R.S. said he liked the teachers at the school, Ms. Drake and Mr. Ruttenberg did not allow teasing in class, Mr. Standerford might allow some teasing but then would stop it, and he had no complaints about Ms. Thompson. (Def. App. [34–2] at 20–21). K.R.S. denied having any problems with M.J., a student he had identified in the answers to interrogatories as a name caller and someone who knocked books out of his hands and bumped into him in the hallways. (*Id.* at 21, 448). S.D's affidavit contradicts K.R.S's testimony in some respects, describing in some detail her observations of how K.R.S. was called names and made fun of in classes led by Mr. Ruttenberg, Mr. Standerford and Ms. Thompson, all of which were described in more general terms in plaintiff's Answer to Interrogatory No. 16(a). (Pl. App. [45–1] at 2–4). Her affidavit goes beyond those incidents to describe her observations of how K.R.S. was called names by kids in the hallways and at lunch and how the "football players" sat together at lunch and made fun of K.R.S. in the presence of teachers. (*Id.* at 1–4).

■ Defendants' summary judgment motion was filed November 4, 2014; S.D.'s affidavit is dated December 1, 2014. Because of the timing of S.D.'s affidavit and its contradiction of some of the statements

K.R.S. made at his deposition, defendants argue it.is effectively "new evidence" or a "sham affidavit" drafted to create a genuine issue of fact on plaintiff's § 504 claim. (Def. Reply [52] at 3). At hearing, plaintiff argued against application of "sham affidavit" precedent as S.D.'s affidavit did not contradict testimony *she* had previously given.

The law in this circuit concerning "sham affidavits" is clear: in responding to a summary judgment motion a party cannot by affidavit directly contradict deposition testimony previously given in order to create a genuine issue of material fact. *City of St. Joseph v. Southwestern Bell*, 439 F.3d 468, 475 (8th Cir.2006); *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir. 1997) (both citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1363 (8th Cir.1983)). There are two requirements for the doctrine to apply: the testimony by a party (or witness) must have been previously committed to deposition and *the same* party (or witness) must attempt to contradict that testimony by subsequent affidavit. *Id.* "District courts ... must use extreme care in examining such issues and only grant summary judgment where 'the conflicts between the deposition and affidavit raise only sham issues.'" *City of St. Joseph*, 439 F.3d at 476 (quoting *Camfield*, 719 F.2d at 1366). The court may allow an affidavit to stand where the affiant states "he was confused in his deposition or where the affiant needs to explain portions of his deposition testimony that were unclear" or "when the affiant's affidavit does not actually contradict his earlier testimony." *Id.*

Here, S.D.'s deposition was not previously taken. K.R.S.'s deposition was taken, but it is not a subsequent affidavit from *him* which is challenged. S.D.'s affidavit does not contradict any testimony *S.D.* had

previously given. The "sham affidavit" doctrine does not apply.

To the extent defendants' objection to the affidavit could be considered as a request for the discovery sanction of preclusion of evidence under Fed.R.Civ.P. 37(b)(2)(A)(ii), the request is denied. While plaintiff's response to Interrogatory No. 16 could have been more specific about S.D.'s knowledge, given the multi-part nature of the interrogatory the Court views subpart (j) requesting the identity of persons with knowledge of the incidents to be unclear and easily misunderstood. There was sufficient information provided in the Answer to Interrogatory No. 16 (together with plaintiff's Answer to Interrogatory No. 3 identifying S.D. as an individual "likely to have information that bears significantly on any claim or defense ... [who] might reasonably be expected to be deposed or called as a witness" and Answer to Interrogatory No. 4 that he had a taped statement from S.D. (Pl. Resist. To Motion to Compel [41] at 9–10)) to alert defendants that she had relevant knowledge and to depose S.D. The Court will consider the affidavit of S.D. as part of the summary judgment record. Subject, however, to defendants' other evidentiary objections such as hearsay or speculation, which will be addressed in the context of the analysis of the substantive claims.

### 2. "Other Incidents" Evidence

A considerable portion of plaintiff's statement of additional material facts and appendix contain materials concerning incidents involving other students, C.N. and S.P., which plaintiff offers in resistance to defendants' argument on the deliberate indifference prong of the analysis on plaintiff's § 504 claim. As discussed *infra,* the focus of the deliberate indifference analysis is on plaintiff's status, how *plaintiff* was treated, what complaints *plaintiff* made

and how the district responded to *plaintiff's* complaints. The evidence concerning other students would require the Court to effectively engage in "mini-trials"[5] concerning collateral issues which have little relevance to the question whether *K.R.S.* was subjected to unlawful harassment based on a disability to which the school district was deliberately indifferent.

### 3. State Reports

Finally, defendants in their summary judgment motion and appendix refer to a survey conducted in January 2013 by the Iowa Department of Education which made findings regarding the learning environment at the school and bullying. (Def. App. [34–20] at 398). The survey post-dates the events at issue in this case, addresses only general issues, and there is no indication any of the present events were covered in the survey group's review. The Court will consider the survey as part of the summary judgment record but does consider it to be of minimal relevance to the substantive issues in front of the Court.

### B. Rehabilitation Act Claim

Plaintiff's primary claim is that defendant School District violated K.R.S.'s rights under the Rehabilitation Act, 29 U.S.C. § 794(a) (referred to as a "§ 504" claim in the case law) by permitting other students to bully and harass him because of his disability (Count IV)[6]. Section 504(a) provides "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded

from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." The parties agree the fundamental analytical framework which should be applied in this case derives from *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), and *Werth v. Board of Directors of the Public Schls. of the City of Milwaukee*, 472 F.Supp.2d 1113 (E.D.Wis.2007).

*Davis* dealt with a school district's liability under Title IX for student-on-student sexual harassment. Three district courts have extended the analytical structure in *Davis* to cases involving student-on-student disability harassment under § 504. *Werth*, 472 F.Supp.2d at 1127; *K.M. v. Hyde Park. Cent. Sch. Dist.*, 381 F.Supp.2d 343, 359–360 (S.D.N.Y.2005); *Biggs v. Bd. of Educ.*, 229 F.Supp.2d 437, 444–445 (D.Md.2002). The elements of a § 504 claim under *Davis/Werth* are:

> (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment.

*Id.* (citing *Biggs*, 229 F.Supp.2d at 444–45 and *K.M.*, 381 F.Supp.2d at 359, 360–61). Defendants' motion challenges each element.

---

**5.** The parties have not briefed this as an issue arising under Fed.R.Evid. 404(b) concerning "prior acts" evidence nor is there sufficient evidence in the summary judgment record for the Court to judge this under that rule of evidence. *See Bair v. Callahan*, 664 F.3d 1225, 1228–29 (8th Cir.2012) (evidence of surgeon's past treatment of other patients not admissible).

**6.** The parties primarily have analyzed this claim on the basis of the Rehabilitation Act. Because the reach of the Rehabilitation Act and Title II of ADA is the same, these provisions are reviewed using the same analysis. *See Werth v. Board of Directors of the Public Schls. of the City of Milwaukee*, 472 F.Supp.2d 1113, 1126 (E.D.Wis.2007).

Defendants have argued that in addition to the elements of a § 504 claim, the Eighth Circuit has added a "bad faith or gross misjudgment" standard to the analysis, citing to *M.P. ex rel. K. v. Ind. Schl. Dist. 721*, 326 F.3d 975, 981–82 (8th Cir. 2003). *M.P.* primarily involved a school district's response to a requested accommodation for a disabled student, in addition to claims of student-on-student disability harassment after the student's mental health condition was publicly disclosed by a school staff member. In deciding plaintiff's § 504 claim, the *M.P.* court utilized a similar but differently articulated standard under which a plaintiff must prove "(1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity . . .; and (3) he was discriminated against on the basis of his disability." 326 F.3d at 982. The Eighth Circuit included a "gross misjudgment" element in its analysis of this standard but did not reference or discuss the *Davis* case or its articulated standard and analysis. The Court agrees with counsel that *Davis/Werth* sets out the appropriate standard. Under either the *Davis* or *M.P.*, however for the reasons discussed below summary judgment with not be granted with respect to plaintiff's § 504 claim.

### 1. Individual with a Disability

■ K.R.S. suffered from ADHD and had measurable problems with written communication which the School District sought to remedy by placing him on an IEP. Placement under an IEP rendered K.R.S. a qualified student under the IDEA. Defendants argue that merely having a learning disability is not a qualifying condition for purposes of § 504 in the absence of a showing that the learning disability substantially limits plaintiff in one or more major life activity. As plaintiff pointed out at hearing, however, defendants admitted plaintiff "was a person with

a disability" as defined by § 504 in their Answer to plaintiff's Second Amended Complaint. (Pl. Second Amend. Complt. [26] at ¶ 36; Def. Ans. [27] at ¶ 11). Furthermore, relevant case law holds that a student with a disability under the IDEA qualifies as an individual with a disability under § 504. *See Werth*, 472 F.Supp.2d at 1128; *K.M.*, 381 F.Supp.2d at 358. The Court finds plaintiff has sufficiently established the first element of his § 504 claim.

### 2. Harassment Based on Disability

Defendants next argue plaintiff's § 504 claim fails on the second element requiring a showing of harassment based on his disability because plaintiff cannot show that the football players who threw footballs at his head did so because he was having difficulty with his writing skills. Plaintiff argues the Court should look at the "constellation of surrounding circumstances, expectations and relationships" including not only the football throwing incidents but also the evidence that in a thirteen-month period before the football throwing incident other students singled K.R.S. out, laughing at him and calling him names such as "stupid," "dumb", "retard", "idiot." (Pl. Resist. Br. [46] at 11–13). Defendants rely on *Werth* and *Hoffman v. Saginaw Pub. Sch.*, No. 12–10354, 2012 WL 2450805 (E.D.Mich. June 27, 2012), in support of their argument on this element of the § 504 claim.

In *Werth* plaintiff had a visible deformity as the result of a congenital bone disorder which resulted in part in a hump on his back. 472 F.Supp.2d at 1116–17. In shop class some students threw wood at plaintiff, striking him in the back. Plaintiff complained to the teacher about the incidents. The teacher first claimed he did not see the incidents but eventually wrote a referral slip against one of the students, who was suspended. *Id.* at 1119. Plaintiff

was out of school for about two months as he suffered numbness in his legs and swelling in his spine after the incident. *Id.* at 1120. After he returned to school, another student threw a pair of safety glasses at plaintiff in shop class in the presence of the same teacher. Although the teacher said he did not observe the incident, he wrote a referral slip for the student who threw the glasses, resulting in a three-day suspension for the offending student. Plaintiff sustained a concussion and cracked teeth as a result of being hit with the safety glasses. *Id.* at 1120–21. Although there was evidence other kids in school had called him names, there was no evidence in the summary judgment record which demonstrated the throwing incidents were related to his disability (there was no proof these specific students had teased or harassed him at any other time based on his disability and the throwing incidents were not coupled with harassing words), the court found plaintiff had not established the "because of" element of his § 504 claim. *Id.* at 1128–29.

In *Hoffman*, the plaintiff also had a visible disability arising from congenital bone disorders. He claimed he was subjected to non-specific bullying by various classmates and by one specific student, D.K., in the second, fourth and fifth grades. The incidents were reported to school officials. 2012 WL 2450805, at *2. At the end of fifth grade on a field trip some children refused to sit next to plaintiff, made jokes about him and "effectively ostracized him." *Id.* At the beginning of plaintiff's sixth grade school year, plaintiff complained that student D.K. was verbally and physically abusing him, although the incidents were not described further. *Id.* Other students engaged in conduct plaintiff complained was harassing, such as asking him if he was attending a school dance, then mocking him when he said he was not, and wishing him happy birthday in a month that was not his birthday. *Id.* The

conduct continued into plaintiff's seventh grade school year, with D.K. doing such things as making sure plaintiff could not get a hall pass to use the restroom, making an obscene gesture at plaintiff in gym class and on one occasion mocking plaintiff's posture and stance. *Id.* at *3. At the end of seventh grade, D.K. and other students threw pizza crusts and potato chip bags at plaintiff during a school field day event. *Id.* at *4. On a motion to dismiss, the district court held the factual record did not suggest that D.K. or any other student harassed plaintiff on the basis of his disability aside from the sole allegation that D.K. had mocked plaintiff's posture. The other incidents did not match up with plaintiff's disability—for instance, the fact students threw potato chip bags and pizza crusts at plaintiff did not suggest they were discriminating against him because of his dietary habits nor did the interference with plaintiff's use of the bathroom suggest some discriminatory animus about using the bathroom. *Id.* at *15. Even assuming the facts as plaintiff alleged them were true, as the court must on a motion to dismiss, the Court found the facts alleged did not support a finding plaintiff was harassed because of his disability. *Id.*

K.R.S.'s case differs from *Werth* and *Hoffman* in that K.R.S.'s disability was an intellectual cognitive disability not a physical disability. His cognitive disabilities would not have been physically apparent to other students so they may not have known the precise nature of the learning disability. The Court infers from the record that plaintiff was a slow learner, socially inept, and exhibited some immature and inappropriate behaviors as compared to his peers. Drawing inferences in favor of plaintiff based on the summary judgment record, there is evidence that would support a finding that other students were aware that K.R.S. had cognitive difficulties

negatively impacting his ability to learn. That evidence includes the fact that Bedford is a relatively small school district, that plaintiff had to repeat 8th grade, and that plaintiff left his regular classes to receive special education instruction. There is evidence from S.D., K.R.S's sisters, and student W.D. who observed unidentified students call K.R.S. "dumb", "stupid," "idiot," "retard," or "moron" in class, in the hallways at school, or while he traveled on the school bus. There is evidence that some of the football players, while not to his face, called K.R.S. "dumb" behind his back and threw food at him during lunch hour. Viewing K.R.S.'s testimony and the evidence from his sisters and S.D. favorably, there is evidence two of the players who called him "dumb," K.C. and C.D., on several occasions hit him in the head with footballs during practice. Thus, there is evidence in the record, although skimpy, from which a trier of fact could conclude that harassing behavior was directed at plaintiff because of his cognitive learning disability. This evidence may strengthen or weaken based on direct and cross-examination at trial, but the Court finds it sufficient at this summary judgment stage.

██ Defendants argue there is no evidence the football players (or other students) were aware of K.R.S.'s specific learning disability; however, that argument is somewhat disingenuous in the environment of a small school where a student's departure from class for special classes is readily observable by all in the classroom, the student has had to repeat a grade which would be known by his peers, and ignores the fact that the name-calling involved could be seen as an indication other students realized the general nature of K.R.S.'s disability. Defendants suggest that plaintiff is required to show that the other students who allegedly harassed plaintiff did so specifically because plaintiff struggled with writing in English class.

This seems like a tortured interpretation of the required elements. The Court does not read the case law on the "based on" element to require those harassing or bullying another individual to understand the precise nature of the disability, only that the conduct can reasonably be connected to the disability.

The particular incidents alleged to have occurred could be found to be connected and reflective of K.R.S.'s disability, unlike the incidents occurring in *Werth* and *Hoffman* which were unaccompanied by anything which could be considered as imitative of or connected to the respective plaintiff's disabilities, such a pejorative describing the plaintiff's physical condition. Although the evidence on this element is marginal, a reasonable jury could find that the incidents of name-calling and football throwing were based on K.R.S.'s disability. For purposes of this motion, there is enough evidence in the record to establish this prong of the § 504 inquiry.

### 3. Severe or Pervasive Harassment

██ Defendants next argue the evidence is insufficient to establish that the incidents involved were "severe or pervasive" because they were "isolated over a period of time and involved different people," many of whom are unspecified. They also point to K.R.S.'s testimony that teasing did not affect his school work, just that ninth grade was harder, and that K.R.S. himself engaged in name calling. (Def. App. [34–2] at 17, 30–31). Plaintiff argues the football throwing incidents were "merely the *de facto* culmination of" the environment through which K.R.S. suffered to the time of his injury, again relying on S.D.'s affidavit. (Pl. Brief [46] at 14).

██ As the Supreme Court noted in the context of gender-based harassment in schools,

It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender ... [D]amages are only available where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 U.S. at 651–52, 119 S.Ct. 1661; *see Werth*, 472 F.Supp.2d at 1127. "The term 'pervasive' implies that something is widespread." *Riccio v. New Haven Bd. of Education*, 467 F.Supp.2d 219, 227 (D.Conn.2006) (peer-on-peer sexual harassment case). "The harassment must ... have a 'concrete, negative effect' on the victim's education, which may include dropping grades, becoming homebound or hospitalized due to harassment, physical violence, or physical exclusion from a school resource," or evidence of emotional trauma. *C.S. v. Couch*, 843 F.Supp.2d 894, 907 (N.D.Ind.2011) (quoting *Davis*, 526 U.S. at 650–51, 119 S.Ct. 1661). "[A]llegations of unarticulated conduct have been shown to be insufficient to defeat summary judgment in hostile-work-environment cases." *Gabrielle M. v. Park Forest–Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir.2003) (citing *Bloomer v. Slater*, 2002 WL 1949728, at *9 (N.D.Ill. Aug. 23, 2002) (refusing to allow plaintiff to rely on vague, general allegations of inappropriate comments to support hostile

environment claim where plaintiff presented no evidence of the details of the offending conduct)).

S.D. stated in her affidavit[7] that she observed kids teasing K.R.S. in the classrooms, hallways and on the bus on a daily basis, calling him names such as "dumb," "stupid," "retard," or "moron". (Pl. App. [45–1] at 1–4). The record also shows that until his head injury, however, K.R.S. had good attendance at school. (Def. App. [34–19] at 379). He did not get into any fights. (Def. App. [34–2] at 24). In spite of the alleged teasing by other kids in the classroom and on the school bus in the thirteen months before he joined the football team, the evidence shows K.R.S. nevertheless decided he wanted to go out for football when one of his friends, S.W., encouraged him to do so. (*Id.* at 5). K.R.S.'s grades had not been good because of his learning disability; there is no evidence they got worse. (Def. App. [34–19] at 378, 380). There is no demonstrated link in the summary judgment record between the general teasing to which K.R.S. was subjected, which the Court will assume for purposes of the motion occurred, and the football throwing incident, for instance, there is no evidence the football players called him names directly as other kids did. On the other hand, K.R.S. was hospitalized for a head injury (which may or may not have been the result of the football throwing incidents) arguably after a year-long period of time when other students teased, called him names and pushed him in the hallways.

On this record, there are sufficient disputes of material fact on this issue that

---

7. Defendants argue that the affidavit of S.D. should be discounted because it does not contain enough specifics about the referenced incidents and is based in large part on hearsay and speculation. The Court finds that the affidavit contains enough specific information about S.D.'s personal observations and beliefs to create disputed factual issues as noted throughout the ruling. The Court does recognize that cross-examination of S.D. at trial may cause a trier of fact to discount all or a portion of the affidavit but believe that is a credibility issue not ripe for resolution on a motion for summary judgment.

summary judgment cannot be entered in favor of defendants.

### 4. Knowledge of Harassment

A school district is not "responsible for the actions of the harassing students, but rather for its own response to the acts of the harassing students." *Werth,* 472 F.Supp.2d at 1127. "School administrators ... cannot escape liability by putting their heads in the sand.... The standard [however] is 'actual knowledge.' School administrators have actual knowledge only of the incidents that they witness or that have been reported to them." *Doe v. Galster,* 768 F.3d 611, 617–18 (7th Cir.2014); *see Bruning v. Carroll Comm. Sch. Dist.,* 486 F.Supp.2d 892, 913–14 (N.D.Iowa 2007).

The football coaches testified K.R.S. did not tell them about the football throwing incidents. K.R.S. testified he told Coach McCoy and Assistant Coach Nally on different occasions some of the other players were throwing footballs at his head. The record also contains evidence demonstrating that K.R.S. told Nurse Schuelke about being hit in the head with footballs when in her office complaining of headaches. Additionally, K.R.S. testified he told teachers and a school bus driver about the teasing and name calling incidents. Furthermore, K.R.S. grandmother believes she mentioned the teasing when meeting with school officials to discuss K.R.S's IEP. On this record and viewing the facts in the light most favorable to plaintiff, there is a factual dispute concerning the School District's knowledge which precludes entry of summary judgment in favor of defendants.

### 5. Deliberate Indifference to Harassment

Defendants argue plaintiff cannot prove the element of deliberate indifference or gross misjudgment because no administrative staff knew K.R.S. was being harassed and once notified of K.R.S.'s head injury and the allegations it was related to football throwing incidents, undertook a formal investigation of the facts. In response plaintiff acknowledges the School District's investigatory efforts after K.R.S.'s head injury was reported, but points to evidence of harassment which had been on-going in the presence of teachers for up to thirteen months prior to the football throwing incidents yet teachers took no action. (Pl. Brief [46] at 18). The anti-bullying/harassment investigation procedure is not clear what steps a teacher must take upon receipt of a complaint of harassment. (Def. App. [34–21] at 431). It appears the school principal is the individual who is to be notified and who initiates the investigation. (*Id.*) That is what occurred in this case when Principal Nally received notice of the police report. As noted previously, the Court has found there is a factual dispute concerning the School District's actual knowledge of the football throwing incidents and the teasing and name calling K.R.S. said he reported to teachers. Plaintiff also argues that K.R.S. reported to Nurse Schuelke that he had been struck in the head with a football but she did not investigate further nor did she report it to the coaches in spite of being aware of the school's eligibility policy regarding participation in athletics. (Pl. App. [45–2] at 128a). Plaintiff argues the school district's lack of response to evidence that K.R.S. was being harassed was unreasonable and deliberate indifference. (Pl. Brief [46] at 21).

A school district's failure to follow its policies/procedures regarding harassment/bullying does not necessarily establish that its actions were unreasonable, that it was deliberately indifferent or committed gross misjudgment. *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 291–92, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). "In examining the deliberate indif-

ference standard in the context of Title IX, ... '[t]he Court must examine the "adequacy of the response" ... in light of the "seriousness and credibility of the complaint that puts school officials on notice." ' " *Gordon v. Ottumwa Comm. Schl. Dist.*, 115 F.Supp.2d 1077, 1082–83 (S.D.Iowa 2000) (quoting *Kinman v. Omaha Public Sch. Dist.*, 171 F.3d 607, 610 (8th Cir.1999) and *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir.2000)); *see Bruning*, 486 F.Supp.2d at 915–916. Because the School District's actual notice regarding the events preceding K.R.S's head injury as well as the event allegedly causing the head injury is a factual dispute here, it is difficult on this summary judgment record to reach any conclusion on the adequacy of the School District's response prior to K.R.S.'s head injury.

For the foregoing reasons, the record evidence is sufficiently disputed that summary judgment in favor of defendants on the § 504 claim is precluded.

## C. State Tort Claims

### 1. Breach of Fiduciary Duty

■■■ Defendants challenge plaintiff's state law claim that the school and Nurse Schuelke breached a fiduciary duty they had to K.R.S., arguing the Iowa courts have not recognized that a public school owes a fiduciary duty to its student. Plaintiff argues the Defendants had a duty to provide a safe and nurturing environment in which K.R.S. could learn (Division VI) and that Iowa courts have not specifically ruled out a fiduciary duty claim, citing to *Stotts v. Eveleth*, 688 N.W.2d 803 (Iowa 2004) as a case in which the Iowa Supreme Court examined whether a fiduciary duty existed between teacher and a student who had not been in a student-teacher relationship. Plaintiff also points to cases in other jurisdictions where courts have recognized a fiduciary duty had arisen. (Pl. Brief [46] at 28–30).

■■■ The Iowa courts (and the courts cited in plaintiff's brief) note that "[a] fiduciary relationship is one in which a person is under a duty to act for the benefit of another as to matters within the scope of the relationship." *Stotts*, 688 N.W.2d at 811 (citing *Mendenhall v. Judy*, 671 N.W.2d 452, 455 (Iowa 2003)). "Because the circumstances giving rise to a fiduciary duty are so diverse, whether such a duty exists depends on the facts and circumstances of each case." *Id.*

> "A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, the placing of reliance by one upon the judgment and advice of the other."

*Id.* (quoting *Econ. Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 647 (Iowa 1995) (citation omitted)). In *Stotts*, the court found no duty existed as defendant had not been plaintiff's teacher and there were no facts in the record on whether plaintiff "reposed faith, confidence, and trust in [defendant]; that she relied on his judgment and advice; or that he dominated and influenced her." *Id.*

The summary judgment record is devoid of facts showing that K.R.S. put faith in the School District or Nurse Schuelke to provide a safe and nurturing educational environment, that he relied on their judgment, or that the School District or Nurse Schuelke dominated or influenced K.R.S. Summary judgment will be granted on defendants' motion with respect to this claim (Division VI).

### 2. Intentional Infliction of Emotional Distress

■■■ Defendants also challenge plaintiff's claim for intentional infliction of emo-

tional distress (Division VII) arguing none of defendants' conduct rose to the level of "outrageous conduct." In support of this argument, Defendants place their focus on the actions taken by the School District after plaintiff's head injury and police report. Plaintiff argues that the evidence that K.R.S. was subjected to bullying and harassment on a daily basis for an entire school year, culminating in the football throwing incidents constitutes the requisite outrageous conduct. In their reply, defendants also argue that plaintiff has presented no evidence of severe or extreme emotional distress.

■ The elements of the Iowa common law tort of intentional infliction of emotional distress are: "(1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate causation of the emotional distress." *Smith v. Iowa State University,* 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Barreca v. Nickolas,* 683 N.W.2d 111, 123–24 (Iowa 2004), quoting in turn *Fuller v. Loc. Union No. 106,* 567 N.W.2d 419, 423 (Iowa 1997)).

Based on the Court's previous analysis and determinations that there are disputed facts concerning the severity/pervasiveness of the alleged harassment, defendants' knowledge of the alleged harassment and whether defendants were deliberately indifferent to plaintiff, the Court finds that there are disputed factual issues regarding whether defendants engaged in outrageous conduct. If the factual disputes are resolved in favor of plaintiff, a reasonable jury could find that a School District and/or School Nurse who allowed such harassment may have engaged in outrageous conduct.

The key problem with plaintiff's claim, however, is that there is no evidence in the summary judgment record that K.R.S. suffered emotional distress, let alone severe or extreme emotional distress. As noted previously, the record also shows that until his head injury, K.R.S. had good attendance at school. (Def. App. [34–19] at 379). He did not get into any fights. (Def. App. [34–2] at 24). In spite of the alleged teasing by other kids in the classroom and on the school bus in the thirteen months before he joined the football team, the evidence shows K.R.S. nevertheless decided he wanted to go out for football when one of his friends, S.W., encouraged him to do so. (*Id.* at 5). K.R.S.'s grades had not been good because of his learning disability; there is no evidence they got worse. (Def. App. [34–19] at 378, 380). There is no record that he was being treated for emotional distress before his head injury nor afterward.

Plaintiff's claim of intentional infliction of emotional distress (Division VII) is not supported by the summary judgment record and will be dismissed.

### 3. Failure to Remove from Athletic Competition/Iowa Code § 280.13C

■ In Division VIII of the Second Amended complaint plaintiff asserts a cause of action for the School District's failure to remove K.R.S. from athletic competition in violation of Iowa Code § 280.13C. That statute, in pertinent part, requires a coach or contest official to remove a student from participation in a high school athletic activity "if a student's coach or contest official observes signs, symptoms, or behaviors consistent with a concussion or brain injury." *Id.* It does not explicitly authorize a private cause of action. *Id.* The Court has not found nor has counsel cited to any Iowa cases hold-

ing a private cause of action is authorized under this statutory section.

 Iowa courts follow a four-part test in determining whether an Iowa statute authorizes an implied private right of action. *Shumate v. Drake University*, 846 N.W.2d 503, 505 (Iowa 2014) (citing *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) and declining to abandon the *Cort* test). " 'Not all statutory violations give rise to a private cause of action. A private statutory cause of action exists "only when the statute, explicitly or implicitly, provides for such a cause of action." ' " *Id.* (quoting *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 254 (Iowa 2012) (quoting in turn *Sanford v. Manternach*, 601 N.W.2d 360, 371 (Iowa 1999))). Where as here there is not explicit authorization of a private cause of action based on the statute, the Court must ascertain the legislative intent and consider

> (1) whether "the plaintiff [is] a member of the class for whose special benefit the statute was enacted"; (2) "[l]egislative intent, either explicit or implicit, to create or deny a remedy"; (3) whether "a private cause of action [is] consistent with the underlying purpose" of the statute; and (4) whether "the implication of a private cause of action [will] intrude into an area over which the federal government has exclusive jurisdiction or which has been delegated exclusively to a state administrative agency."

*Shumate*, 846 N.W.2d at 507–08. (quoting *Mueller*, 818 N.W.2d at 254).

The second *Cort* factor is not met here. Section 280.13(C) falls in Chapter 280 of the Iowa Code, which lists a variety of "Uniform School Requirements" for public schools in the state of Iowa. A few of the subsections within that chapter clearly contemplate serving as a basis for liability in a civil action. For example, § 280.21, "Corporal punishment—burden of proof," explicitly states "[t]o prevail in a civil ac-

tion alleging a violation of this section the party bringing the action shall prove the violation by clear and convincing evidence," and that a school employee who has been "determined in a civil action to have been wrongfully accused under this section" is entitled to an award of monetary damages. Iowa Code § 280.21(3). In § 280.26, a school employee "who intervenes in a fight or physical struggle ... shall be awarded reasonable monetary damages against a party bringing a civil action" based on the section if a determination is made the employee was wrongfully accused. *Id.* § 280.26(3). In § 280.28 "Harassment and bullying prohibited—policy—immunity," school employees who report harassment or bullying incidents in good faith are immune from civil or criminal liability with respect to such reports. *Id.* § 280.28(5). From this, it is clear the legislature did not intend to create a private right of action based on violation of § 280.13C as the provisions addressing liability in other sections of the chapter show that if the legislature "wished to provide a private damage remedy, it knew how to do so and did so expressly." *Shumate*, 846 N.W.2d at 512 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)).

Summary judgment will be granted with respect to Division VIII of the Second Amended Complaint.

### 4. Negligence

Divisions IX and X of plaintiff's Second Amended Complaint assert common law negligence claims. In Division IX plaintiff alleges defendant School District was negligent by failing to remove K.R.S. from participation in athletic competition; in Division X they allege Nurse Schuelke was negligent in failing to provide reasonable medical care.

██ "[S]chool districts have a duty of reasonable care in providing for the safety of students from the harmful actions of fellow students, a teacher, or other third persons." *Brokaw v. Winfield–Mt. Union Community School Dist.*, 788 N.W.2d 386, 390–91 (Iowa, 2010) (citing *Godar v. Edwards,* 588 N.W.2d 701, 708 (Iowa 1999)); *Bruning,* 486 F.Supp.2d at 921. That duty, however, is limited "by what risks are foreseeable." *Brokaw,* 788 N.W.2d at 391 (quoting *Godar* ); *Bruning,* 486 F.Supp.2d at 921. A "risk is sufficiently foreseeable to provide a basis for liability when 'the actor [has] sufficient knowledge of the immediate circumstances or the general character of the third party to foresee that party's misconduct.' " *Brokaw,* 788 N.W.2d at 392–93 (quoting *Restatement (Third) of Torts: Liab. for Physical and Emotional Harm* § 19, at 220 (2010)).

██ Similar to the record on plaintiff's § 504 claim, with respect to the specification that the School District failed to remove K.R.S. from athletic competition, there are factual disputes about when, if at all, the School District received notice that K.R.S. had sustained a head injury that would have precluded him from participating in football. K.R.S. testified he told the coaches two players were throwing footballs at his head. (Def. App. [34–2] at 9). Some other players observed K.R.S. being hit in the head with a football. (*Id.* [34–9] at 299; [34–10] at 314, 317; [34–12] at 340–341; [34–22] at 447–448; Pl. App. [45–2] at 123, 175). The coaches do not remember K.R.S. complaining about this nor did they observe him getting hit in the head with footballs. (*Id.* [34–4] at 142; [34–7] at 205). K.R.S. says he told the coaches he was having headaches. Two coaches recall K.R.S. complaining of headaches at some unspecified times during the school day but not at practices. (*Id.* [34–5] at 161; [34–6] at 179). Neither asked him what might be causing his headaches or did anything about his headache complaints.

(*Id.*) K.R.S. saw Nurse Schuelke on several occasions complaining of headaches, specifically attributing them to footballs being thrown at his head, but Nurse Schuelke did not go to the coaches with this information (Def. App. [34–8] at 242).

██ As for the claim that Nurse Schuelke failed to provide reasonable medical care, it is undisputed that K.R.S. visited her on at least two occasions complaining of headache and double vision which he said started after he was hit in the head with footballs. Because of the credibility issues arising from her duplication of lost notes, however, the dates when Nurse Schuelke saw K.R.S. are disputed, indeed all her testimony at this stage is tarnished by the "lost notes" issue. In resistance to the summary judgment motion, plaintiff has included a report from their nursing expert witness Martha Dewey Bergren which criticizes how Nurse Schuelke responded to K.R.S.'s complaint of headaches in connection with football practice in several respects. The Court cannot determine credibility issues on summary judgment and there is a debate in the record about the adequacy of Nurse Schuelke's practices concerning K.R.S.

Based on this summary judgment record the Court finds there are disputed facts which preclude entry of summary judgment in favor of defendants on plaintiff's negligence claims in Divisions IX and X.

**5. Discretionary Function Immunity**

██ Finally, defendants argue they are entitled to immunity from plaintiff's state law claims under the discretionary function provision of the Iowa Code which exempts municipalities and their agents from tort claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty...." Iowa Code § 670.4. "[L]iability is the rule and immunity the exception."

*Doe v. Cedar Rapids Comm. Schl. Dist.,* 652 N.W.2d 439, 443 (Iowa 2002). In determining whether the discretionary function applies, the Iowa Supreme Court follows a two-step analysis

> (1) Did the challenged conduct involve an element of choice or discretion? (2) If discretionary judgment was involved, was the decision or course of action driven by public policy concerns grounded on social, economic or political considerations?

*Ette v. Linn–Mar Cmty. Sch. Dist.,* 656 N.W.2d 62, 68 (Iowa 2002); *see Bruning,* 486 F.Supp.2d at 920–21. Defendants have the burden of proving they are entitled to protection under the statute. *Bruning,* 486 F.Supp.2d at 920.

With respect to the conduct of the coaches and Nurse Schuelke, the first prong of the analysis is satisfied—all would have exercised professional judgment with respect to a student's complaint of a possible head injury. It is with respect to the second prong, whether their exercise of judgment was "driven by public policy concerns grounds on social, economic or political considerations," that defendants' argument fails. Defendants do not identify any social, economic or political consideration as a basis for the coaches' permitting K.R.S. to participate in football after he complained of a headache (which for purposes of this motion the Court will assume occurred) or for Nurse Schuelke's decision to have K.R.S. report his headaches to his grandmother and to accept his word he was not participating in practices instead of reporting K.R.S.'s complaints to the coaches. As was the case in *Bruning,* it is the School District's "course of conduct which permitted plaintiff to be subjected to repeated acts of harassment" which is at issue and "[t]hat course of conduct is not one driven by public policy implications uniquely within the purview of" the School District and its employees. 486 F.Supp.2d at 921.

Defendants have not met their burden of showing they are immune from liability for the state law claims under the discretionary function exception.

### D. Punitive Damages

 As narrowed by the motion papers, plaintiff now seeks punitive damages only against Nurse Schuelke individually on the claim she failed to provide reasonable medical care. (Pl. Resist. [46] at 46). Under Iowa law, punitive damages may not be based on "mere negligent conduct" and may only be awarded upon a showing of actual or legal malice. *McClure v. Walgreen Co.,* 613 N.W.2d 225, 231 (Iowa 2000). "Actual malice is characterized by such factors as personal spite, hatred, or ill will.... Legal malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights." *Id.*

 At this stage the summary judgment record regarding Nurse Schuelke's conduct in treating K.R.S. is skimpy at best. There is an evidentiary issue regarding her destruction of the original notes and re-creation of them and the effect that conduct should be given. Under Iowa procedures an adverse inference instruction could be given, depending on how the evidence at trial on this issue presents. *See Lynch v. Saddler,* 656 N.W.2d 104, 111 (Iowa 2003). Use of that inference, however, "should be utilized prudently and sparingly." *Id.* (quoting *Phillips v. Covenant Clinic,* 625 N.W.2d 714, 720 (Iowa 2001), citing in turn *Crosser v. Iowa Dep't of Pub. Safety,* 240 N.W.2d 682, 685 (Iowa 1976)). For the present, the Court will not grant summary judgment with respect to punitive damages. The parties may revisit the sufficiency of the punitive damage evidence with the Court after a more comprehensive evidentiary record is established at trial.

## IV.

### CONCLUSIONS AND ORDER

Based on the summary judgment record submitted by the parties and the discussion above, the Court concludes plaintiff sufficiently has shown there are genuine fact issues to be determined at trial on the claim arising under the Rehabilitation Act (§ 504) in Division IV and the negligence claims in Divisions IX and X. Defendants' motion for summary judgment is denied with respect to those claims. Furthermore, the motion for summary judgment is denied with respect to any punitive damage claims against Nurse Schuelke related to the surviving negligence claim.

The parties have stipulated the claims in Divisions VI through X may be dismissed without prejudice as to defendants Joe Drake, Dana Nally, Deb Bonde, and Robert McCoy. Plaintiff has withdrawn Division V (§ 1983) of his Second Amended Complaint.

There are no genuine fact issues with respect to the claims in Divisions VI (breach of fiduciary duty), VII (intentional infliction of emotional distress) and VIII (Iowa Code § 280.13C claim) and defendants are entitled to summary judgment as a matter of law on those claims.

Defendants' motion for summary judgment [34] is **granted in part and denied in part** as noted above.

. IT IS SO ORDERED.